IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Kyle D., | : | |
|     Plaintiff, | : | |
| vs. | : | Case No. 3:22-cv-00104-WHR-TPK |
| | : | Judge Walter H. Rice |
| Commissioner of | | Magistrate Judge Kemp |
| Social Security, | : | |
|     Defendant. | : | |

**REPORT AND RECOMMENDATION**

    Plaintiff filed this action seeking review of a final decision of the Commissioner of Social Security.  That decision, issued by the Appeals Council on March 11, 2022, denied his applications for social security disability benefits and supplemental security income.  Plaintiff filed a statement of errors on July 25, 2022 (Doc. 8) to which the Commissioner responded on September 8, 2022 (Doc. 9).  For the following reasons, it will be recommended that the Court **SUSTAIN** Plaintiff's statement of errors and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

**I.  INTRODUCTION**

    Plaintiff filed his applications on September 17, 2013, alleging that he became disabled on May 31, 2013. From there, the matter proceeded through various levels of review, including three administrative hearings (held in 2015, 2017, and 2019), a remand from the Appeals Council between the first and second hearings, and a remand from this Court between the second and third.  *See Danielson v. Comm'r of Social Security*, 2019 WL 1760071 (S.D. Ohio Apr. 22, 2019), *report and recommendation adopted* 2019 WL 2011077 (S.D. Ohio May 7, 2019). Further procedural history can be found in the Court's April 22, 2019 Report and Recommendation.

    The most recent administrative hearing was held on December 9, 2019, and involved the question of whether Plaintiff should be awarded a closed period of disability.  The Administrative Law Judge subsequently issued an unfavorable decision on January 27, 2020.  In that decision, he first found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014, and that he had not engaged in substantial gainful activity between his alleged onset date and the date of June 1, 2019, when Plaintiff became gainfully employed.  The ALJ next concluded that Plaintiff suffered from severe impairments including mild degenerative disc disease of the lumbar spine, obesity, carpal tunnel syndrome, depression,

and anxiety. However, the ALJ also found that none of these impairments, taken singly or in combination, met the criteria for disability found in the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ found that all during the relevant time period, Plaintiff could perform a reduced range of light work. According to the ALJ, Plaintiff had ten different limitations in his functional capacity, including the ability to crouch, crawl, kneel, stoop, and climb ramps and stairs only occasionally; an inability to climb ladders, ropes, or scaffolds; an inability to work around workplace hazards; the inability to use his arms for pulling, pushing, reaching, and handling more than frequently; the ability to engage in overhead reaching with his right arm only occasionally; the ability to perform only simple, repetitive, unskilled tasks; the ability to have only occasional superficial contact with coworkers and supervisors; the inability to have any contact with the general public; the inability to do fast-paced production work or work with strict production quotas; and, finally, the inability to do jobs which involved more than a minor amount of changes in job duties or work routines from one day to the next.

Moving on with the process, the ALJ determined that with these limitations, Plaintiff could not, based on testimony given by the vocational expert, perform any of his past relevant work. However, he could do light, unskilled jobs such as marker, copy machine operator, and warehouse checker. As a result, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

In his statement of errors, Plaintiff raises two issues. He asserts that, first, the ALJ failed to recognize limitations stemming from Plaintiff's carpal tunnel syndrome prior to surgery, and, second, failed to account for all of Plaintiff's mental limitations.

## II. STANDARD OF REVIEW

As this Court said in *Jeter v. Comm'r of Soc. Sec. Admin.*, 2020 WL 5587115, at \*1–2 (S.D. Ohio Sept. 18, 2020)**,**

> Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.' " *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of

"more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.' " *Rabbers,* 582 F.3d at 651 [quotations and citations omitted].

### III.  FACTUAL BACKGROUND

In its prior decision, this Court identified two flaws in the Commissioner's decision-making process - the same two flaws which Plaintiff again advances as grounds for reversal or remand.  As the Court noted,

> First, in concluding that Plaintiff was capable of work that required frequent use of his upper extremities, the ALJ found dispositive that Plaintiff "underwent carpal tunnel release surgery and follow up treatment notes confirm an excellent result with no complaints of post-operative pain or other symptoms." PageID 91. The ALJ's reliance on post-operation treatment notes, in this regard, is error because Plaintiff's surgery occurred on October 16, 2015 -- two years after the alleged disability onset date.... The ALJ exclusively considered Plaintiff's abilities after the surgery. PageID 90-91. In so doing, he committed reversible error by failing to consider whether Plaintiff's carpal tunnel may have caused him to be disabled during the two years before the surgery.

*Danielson*, 2019 WL 1760071, at *3.  Second, the Court found, as to the ALJ's evaluation of Plaintiff's mental impairment, that there was

> error in the ALJ's determination of Plaintiff's mental RFC. In particular, the ALJ asserted that "it is not reasonable to find that superficial [is] more restrictive than occasional," and therefore included in Plaintiff's RFC only a restriction to "occasional contact with coworkers and supervisors."6 PageID 95. However, occasional and superficial are not coterminous. Instead, " '[o]ccasional contact' goes to the quantity of time spent with [ ] individuals, whereas 'superficial contact' goes to the quality of the interactions." [citation omitted]

*Id*. at *4.  The Court also noted that there was "sufficient evidence in the record to support a conclusion that the Plaintiff should be limited to superficial contact." *Id*. at n.6.  The remand

was ordered in order to permit the Commissioner to address these two issues.  The Court's summary of the record will also focus on the evidence pertaining to them.

### A. Carpal Tunnel Syndrome

Plaintiff, who was 33 years old at the time of the first administrative hearing, and who had graduated from college with a degree in physics, had been working as a graduate assistant at Wright State University up until his alleged onset date.  He testified at the first administrative hearing that he left that job for mental health reasons, and left his prior employment - working on the assembly line at a furniture factory - due to his carpal tunnel syndrome.  Although he identified his mental health issues as the primary reason he could not return to work, he said that his physical issues played into his disability as well.  At that time, he had not had carpal tunnel surgery, and his symptoms had improved since he left the furniture factory, but he still dropped objects such as dishes and silverware.  At the second administrative hearing, which post-dated his 2015 surgery, he said that he was no longer having pain in his left wrist, but his right hand still fell asleep, especially if he spent an extended amount of time using a computer or carrying objects.

The relevant medical records show, first, that Plaintiff was diagnosed with carpal tunnel syndrome as early as 2008.  At that time, he reported intermittent symptoms when driving, using a cell phone, or lifting grocery bags.  He had been prescribed braces for his condition and, as of January of the following year, had no work restrictions.

On October 9, 2013, shortly after his onset date, Plaintiff was seen by Dr. Danopulos for a consultative examination.  Bilateral carpal tunnel syndrome was one of his three major complaints, and he reported losing feeling in several of his fingers in 2008.  On examination, his hands appeared normal and painless and his grip strength was in the upper normal level.  Dr. Danopulos could not confirm the existence of carpal tunnel syndrome and concluded that Plaintiff could perform all normal work activities.  (Tr. 649-54).

When seen by a different consultative examiner, Dr. Brown, in 2014, Plaintiff was no longer wearing his braces because his symptoms had improved.  However, he still had weakness in his hands when doing dishes and would lose his grip.  On testing, his grip strength was normal and he did not exhibit any hand pain on examination except for some tenderness in the left hand.  He had positive Tinel's sign in his left wrist and elbow, but not his right, and had bilateral thenar atrophy.  His pinching ability was also characterized as abnormal.  Dr. Brown thought his ability to bend, stoop, walk, lift, crawl, squat, travel, and push and pull heavy objects was mildly affected by all of his impairments, which included low back problems.   She did not comment on his ability to finger, handle, or manipulate objects, but noted on a form attached to her report that he could write and pick up a coin.  (Tr. 762-70).

Plaintiff continued to report symptoms of carpal tunnel syndrome after that date.  A treatment note from June of 2015 shows that Plaintiff told his doctor that he was unable to perform routine daily activities such as doing dishes, using a computer, or bathing.

Examinations done that year also showed decreased grip strength, and he reported numbness in both hands, more on the left than the right, brought on even by holding a cell phone. He was referred to occupational therapy and did home exercises, but saw no improvement. Some objective abnormalities are noted in the treatment records as well. An EMG done in July showed severe left median neuropathy at the wrist and moderate right median neuropathy at the wrist, and Plaintiff showed some bilateral weakness in thumb abduction. After consulting with his physician, Plaintiff opted for surgery on his left wrist, which took in October of 2015. As noted in his testimony, and as the treatment records confirm, Plaintiff did well after the surgery.

Dr. Bertani, a state agency reviewer, considered Plaintiff's physical limitations as of May 3, 2014. As to his carpal tunnel syndrome, she noted the diagnosis of bilateral carpel tunnel syndrome, and also summarized the findings made at Dr. Brown's consultative examination. She concluded that he had limitations in both handling and fingering, but thought he could do both frequently. (Tr. 186-88).

### B. Mental Limitations

As noted above, Plaintiff said that the primary reason he left his last job was because he could not tolerate its psychological demands. At the first administrative hearing, he described a number of psychologically-based symptoms, including homicidal and suicidal thoughts, lethargy, hypomanic behavior, and inappropriate outbursts of laughter. He had violent mood swings which could occur very close in time to each other. Additionally, he experienced anxiety attacks and had problems with aggression. At the next hearing, he said he continued to have problems with depression and suicidal thoughts, and also struggled with his concentration. He testified to becoming irritable with people as well.

The vast majority of the treatment records (and they are voluminous) deal with Plaintiff's mental health conditions. For the most part, the observations made in those records are accurately summarized in the ALJ's decision (Tr. 1434), and Plaintiff does not take issue with that characterization. There are numerous normal findings about memory, concentration, attention, impulse control, and panic attacks, and his judgment and insight appeared to be intact.

The state agency reviewers concluded that Plaintiff had some moderate limitations in his ability to function from a psychological standpoint. There is an opinion from Dr. Houseknecht, who treated Plaintiff between 2011 and 2013, to the effect that Plaintiff struggled to maintain stability in the work setting. Additionally, Plaintiff's mental health nurse concluded that Plaintiff had a number of marked limitations and would miss four days of work per month.

### IV. DISCUSSION

### A. Carpal Tunnel Syndrome

As explained above, one of the two issues which formed the basis for the 2019 remand order was the ALJ's evaluation of Plaintiff's carpal tunnel syndrome, which relied on the post-

surgery notes to the virtual exclusion of the evidence about that impairment from 2013 to 2015, when the surgery occurred. The ALJ's 2017 decision said little about this impairment, noting only that "the clinical findings concerning the claimant's carpal tunnel syndrome do not support the degree of severity reported in EMG testing" and that "[t]he claimant had carpal tunnel syndrome, but underwent successful surgery and confirmed that he experienced no difficulty with the left hand and reported only that his right hand went to sleep." (Tr. 43-44). That led the ALJ to impose only one functional restriction on the upper extremities, limiting Plaintiff to "frequent use of the upper extremities for pushing, pulling, reaching, and handling...." (Tr. 39).

In his decision following remand, the ALJ did add an additional restriction concerning the use of the upper extremities. He found that Plaintiff could only occasionally, rather than frequently, use his right arm for overhead reaching. (Tr. 1431). He again concluded that Plaintiff could use both upper extremities frequently for pushing, pulling, reaching (except as noted), and handling. The ALJ acknowledged Plaintiff's testimony that, prior to his surgery, he had difficulty picking up small items, gripping, and using a keyboard, and also that he dropped objects like plates, but the ALJ appeared to place great reliance on the fact that Plaintiff was able to watch Netflix and play video games (something he referred to at least four times). (Tr. 1432-33). He also cited to Dr. Danopulos' 2013 findings that Plaintiff's grip strength was normal and that his hand examination was normal as well (although, overall, the ALJ assigned that opinion little weight). (Tr. 1433, 1435). Further, the ALJ noted that Plaintiff could, during Dr. Brown's examination, pick up a coin and write with a pen. The ALJ concluded that the record showed that "[a]t all times, the claimant maintained normal grip strength, manipulation, and fine coordination," (Tr. 1433). Consequently, he did not impose any limitations on Plaintiff's ability to finger or manipulate objects, and found that Plaintiff could frequently (as opposed to continuously) handle them. It was this level of limitation which the ALJ imposed over the entire time frame at issue, both before and after Plaintiff's carpal tunnel surgery. His decision recites that Dr. Bertani also limited Plaintiff to frequent manipulation and he gave her opinion "some weight," commenting that her findings were "mostly consistent with the overall objective evidence, however, additional evidence suggests greater limitations to work hazards and postural movements." (Tr. 1435).

It is not immediately evident from the ALJ's decision why he both considered Dr. Bertani's opinion to be too optimistic a view of Plaintiff's functional capacity and, at the same time, he declined to limit Plaintiff's ability to finger. Plaintiff suggests that the decision rests on the ALJ's lay interpretation of the medical evidence, and that in order for the ALJ to have made his determination properly, he should have obtained additional medical opinion evidence. *See, e.g., Banks v. Comm'r of Social Security*, 2020 WL 5757173 (S.D. Ohio Sept. 28, 2020). The Commissioner's memorandum does not specifically address this apparent inconsistency, nor does it cite to other medical evidence which would allow even a lay person to conclude that Plaintiff had no fingering limitation. It cannot be determined from this record whether such an additional limitation would affect Plaintiff's ability to do the jobs identified by the vocational expert, nor, for that matter, can it be determined whether the evidence of a worsening of Plaintiff's symptoms between May, 2014 and his surgery in October, 2015, further impacted his ability to use his hands in a work setting. The case must therefore be remanded for further

consideration of these issues.

### B. Mental Limitations

As noted above, the Court's review of the ALJ's 2017 decision found issues with the way the ALJ restricted Plaintiff's ability to deal with others, particularly focusing on the ALJ's failure to find that Plaintiff could not tolerate more than superficial interactions with others in light of significant evidence suggesting that to be the case. The ALJ had concluded, in that decision, that Plaintiff could have occasional contact with others, but he said nothing about the quality of that contact. After the Court's remand order, the ALJ altered this portion of his decision, determining that any contact with coworkers and supervisors could only be superficial and occasional. (Tr. 1431). While that would appear to have addressed the Court's express concern, Plaintiff now makes some additional arguments about the mental residual functional capacity which go beyond how well and how often he can relate to others.

The Court need not devote much discussion to this claim. Although Plaintiff makes much of the fact that the ALJ characterized many of Plaintiff's mental impairments as mild, the issue is not how those impairments were described, but how they impacted his ability to function in the workplace. Here, the ALJ imposed a significant number of mental limitations, including not only the restriction on interaction with others, but also limits on the types of tasks Plaintiff could be expected to perform and the type of work environment in which he could function. Plaintiff argues that there was evidence in the record - particularly the reports from Dr. Houseknecht and Nurse Fussichen - which would support greater limitations. While that may be true, the question is not whether substantial evidence would support a different conclusion, but whether substantial evidence supports the decision actually made. *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 839–40 (6th Cir. 2006) ("the findings of an ALJ are not subject to reversal merely because there is substantial evidence in the record to support a different conclusion"). The ALJ provided reasons for discounting both of these opinions, and those reasons find support in the record. Consequently, the Court affirms that portion of the ALJ's decision concerning the extent of Plaintiff's mental functional limitations.

### V. CONCLUSION AND ORDER

For the reasons stated above, it is recommended that the Court **SUSTAIN** Plaintiff's statement of errors and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

                                               **/s/ Terence P. Kemp**
                                               **Terence P. Kemp**
                                             **United States Magistrate Judge**

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a forfeiture of the right to *de novo* review by the District Judge and forfeiture of the right to appeal the judgment of the District Court. Even when timely objections are filed, appellate review of issues not raised in those objections is forfeited. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).